Slip Op. 09-132

UNITED STATES COURT OF INTERNATIONAL TRADE

PAPIERFABRIK AUGUST KOEHLER AG
and KOEHLER AMERICA,INC.,

        Plaintiffs,

        – and –

MITSUBISHI INTERNATIONAL CORPORATION,
MITSUBISHI HiTECH PAPER FLENSBURG
GmbH, and MITSUBISHI HiTECH PAPER
BIELEFELD GmbH,

        Plaintiff-Intervenors,

        v.

UNITED STATES and the UNITED STATES
INTERNATIONAL TRADE COMMISSION,

        Defendants,

        – and –

APPLETON PAPERS INC.,

        Defendant-Intervenor.

Before: Pogue, Judge

Court No. 08-00430

**Public Version**

OPINION

[Plaintiffs' motion for judgment on the agency record denied;
judgment entered for Defendants.]

Dated: November 17, 2009

Hunton & Williams LLP (Richard P. Ferrin and William
Silverman)for Plaintiffs.

Steptoe & Johnson LLP (Jamie B. Beaber and Eric C. Emerson) for
Plaintiff-Intervenors.

James M. Lyons, General Counsel, Neal J. Reynolds, Assistant
General Counsel for Litigation, Office of the General Counsel,
U.S. International Trade Commission (Marc A. Bernstein) for

Defendant U.S. International Trade Commission.

King & Spalding LLP (Gilbert B. Kaplan, Daniel L. Schneiderman and Joseph W. Dorn) for Defendant-Intervenor.

**Pogue, Judge:** In this action, Plaintiff Papierfabrik August Koehler AG and its subsidiary importer Koehler America, Inc. (collectively "Plaintiffs" or "Koehler") seek review of the United States International Trade Commission's ("Defendant" or "the Commission" or "ITC") final determination that the domestic producers of certain light weight thermal paper ("LWTP") are threatened with material injury by reason of imports of subject LWTP from Germany. See Certain Lightweight Thermal Paper from China and Germany, 73 Fed. Reg. 70,367 (ITC Nov. 20, 2008) (final determinations) ("Comm'n Final Determination").[1]

Because the court concludes that the Commission's determination, issued pursuant to Section 735(b)(1)(A)(ii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673d(b)(1)(A)(ii) (2006),[2] is supported by substantial evidence, Plaintiffs' motion for judgment on the agency record is denied, and the Commission's

---

[1] The views of the Commission are contained in Certain Lightweight Thermal Paper from China and Germany, Views of the Commission, USITC Pub. 4043, Inv. Nos. 701-TA-451 & 731-TA-1126-1127 (Final) (Nov. 2008), Admin. R. Pub. Doc. 285 ("Comm'n Views").

[2] Further citation to the Tariff Act of 1930 is to Title 19 of the U.S. Code, 2006 edition.

determination is affirmed in all respects.  Plaintiffs

essentially request that the court re-weigh evidence that the

Commission alone has been authorized to weigh.  See Goss Graphics

Sys., Inc. v. United States, 22 CIT 983, 1008-09, 33 F. Supp. 2d

1082, 1104 (1998) ("[T]he ITC has the discretion to make

reasonable interpretations of the evidence and to determine the

overall significance of any particular factor in its analysis[,]

[and] the court may not reweigh the evidence or substitute its

judgment for that of the ITC.") (quotation marks and citations

omitted), aff'd 216 F.3d 1357 (Fed. Cir. 2000).

The court has jurisdiction over this case pursuant to

28 U.S.C. § 1581(c).

## BACKGROUND

A.   Administrative Proceedings Below

Beginning with its September 19, 2007, petition to the

United States Department of Commerce ("Commerce" or "the

Department") and the Commission to initiate investigations of

certain LWTP from China, Germany, and Korea,[3] Appleton Papers,

---

[3] The investigation with respect to Korea was terminated due
to insufficient import quantity. Certain Lightweight Thermal
Paper From China, Germany, and Korea, 72 Fed. Reg. 70,343 (ITC
Dec. 11, 2007) (preliminary determinations) ("The Commission also
determines that imports of certain lightweight thermal paper from
Korea are negligible, and therefore, terminates its investigation
with regard to Korea."). The Commission's "determination
concerning subject imports from China is not the subject of any
litigation." (Def.'s Mem. in Opp'n to Mot. of Pls.' for J. on

Inc. ("Appleton" or "Defendant-Intervenor") has alleged, *inter alia*, that these products were being sold at less than fair market value ("LTFV"). (Compl. ¶ 6; Def.-Intervenor's Mem. in Opp'n to Pls.' Mot. for J. on Agency R. Under Rule 56.2 ("Def.-Intervenor's Mem.") 3-4; Comm'n Final Determination, 73 Fed. Reg. at 70,367.)

After notice and administrative proceedings, Commerce, on October 2, 2008, issued its final determination, pursuant to 19 U.S.C. § 1673d(a)(1), finding that imports of LWTP from Germany are being, or are likely to be, sold in the United States at LTFV. Lightweight Thermal Paper from Germany, 73 Fed. Reg. 57,326 (Dep't Commerce Oct. 2, 2008) (notice of final determination of sales at less than fair value) ("Commerce Final Determination").  Koehler was a mandatory respondent in this investigation, id. at 57,327 n.4, and was assigned a weighted-average dumping margin[4] of 6.50% for all subject merchandise. Id. at 57,328.  All other respondents received the same 6.50% rate. Id.  There is no indication in the record that Koehler contested this final  determination.

---

Agency R. Under Rule 56.2 ("Def.'s Mem.") 5 n.1.)

[4] The weighted-average dumping rates were determined for the period from July 1, 2006 to June 30, 2007. Commerce Final Determination, 73 Fed. Reg. at 57,328.  The Commission's period of investigation ("POI") was from January 1, 2006 to June 30, 2008. Comm'n Views at 3-4.

Following Commerce's determination, on November 20, 2008,
the Commission issued its final determination that a domestic
industry is threatened with material injury by reason of LWTP
imports from Germany. Comm'n Final Determination, 73 Fed. Reg. at
70,367; but see id. at 70,367 n.2 (noting the dissenting opinions
of Chairman Shara L. Aranoff, Vice Chairman Daniel R. Pearson,
and Commissioner Deanna Tanner Okun). Giving effect to the
Commission's determination, Commerce issued an antidumping duty
order on LWTP from Germany. Lightweight Thermal Paper from
Germany and the People's Republic of China, 73 Fed. Reg. 70,959
(Dep't Commerce Nov. 24, 2008) (antidumping duty orders)

Plaintiffs and Plaintiff-Intervenors now challenge the
Commission's determination. Specifically, Plaintiffs contest the
Commission's treatment of the relevant domestic industry; its
decision to include the entire class of subject imports within
its threat analysis; its determination regarding the likelihood
of increase in German LWTP imports; its likely price effect
determination; and its determination with respect to the
vulnerability of the domestic industry. After describing the
Commission's determinations and reasoning and explaining the
relevant standard of review, the court will discuss each
challenge in turn.

B.   Commission Determinations and Reasoning

LWTP is paper with a thermal active coating which, when used in printers containing thermal print heads, reacts to heat to form images on paper. Comm'n Views at 5.  This type of paper "is typically (but not exclusively) used in point-of-sale applications such as ATM receipts, credit card receipts, gas pump receipts, and retail store receipts." Commerce Final Determination, 73 Fed. Reg. at 57,327.  Commerce's definition of the scope of imported merchandise under investigation included both "jumbo" rolls, a semifinished version of the product, and "slit" rolls, the end-use product. See Commerce Final Determination, 73 Fed. Reg. at 57,327 n.5; Comm'n Views at 5. Producers of jumbo rolls are referred to as "coaters," whereas producers who subsequently convert the jumbo rolls into slit rolls are referred to as "converters." See Comm'n Views at 5-8. Koehler and Plaintiff-Intervenors are coaters who accounted for all imports of LWTP from Germany subject to the investigation at issue in this case. Id. at 3.  Appleton is one of the two domestic coaters of LWTP. Id. at 15.

Most LWTP is sold in the United States in basis weights of either 48 grams per square meter ("48 gram") or 55 grams per square meter ("55 gram"). Id. at 16.  During the POI, the Commission found that domestic coaters' shipments of 55 gram LWTP

far exceeded their shipments of 48 gram LWTP, <u>id.</u>; in fact,

"domestic industry did not produce comparable 48 gram jumbo rolls

for the vast majority of the period of investigation." <u>Id.</u> at 30.

Appleton introduced a 48 gram product in 2007, which became

available in the fall of that year. <u>Id.</u>  At the same time, the

quantity of shipments to the United States of 55 gram LWTP from

Germany declined during the POI, while the quantity of shipments

of 48 gram LWTP increased. <u>Id.</u> at 16-17.

The Commission determined that subject imports of 55 gram

LWTP from Germany generally oversold the domestic like product,

<u>see id.</u> at 32, while subject imports of 48 gram LWTP from Germany

generally undersold the domestic like product. <u>See id.</u>[5]

Nevertheless, the Commission found that sales of 48 gram LWTP

from Germany "could not have taken significant sales or revenues

from domestically produced 48 gram jumbo rolls throughout 2007,

because Appleton did not offer such products during much of the

year and [the other domestic coater] did not offer a competitive

[] product." <u>Id.</u> at 36.

_____

[5] <u>See Certain Lightweight Thermal Paper from China and
Germany</u>, Confidential Views of the Commission, Admin. R. Con.
Doc. 522 ("<u>Comm'n Views (Conf.)</u>") at 52-53 ("The [55 gram]
subject imports from Germany oversold the domestic like product
in [[     ]] quarterly comparisons. . . .  The [48 gram]
subject imports undersold the domestically produced product in
[[     ]] quarterly comparisons.") (footnotes omitted).

Although the Commission determined that "[o]verall domestic industry financial performance declined from 2005 to 2007," id. at 35, it did not "attribute the declines in 2007 financial performance to the increased quantities of subject imports from Germany, [] because the subject imports from Germany increased at a time of rising demand, did not capture significant additional market share, and did not have significant adverse price effects." Id. (footnote omitted).  The Commission found that "the increase in subject imports from Germany involved [48 gram jumbo rolls, which were] types of products not consistently offered by the domestic industry, although by interim 2008 the domestic industry was increasingly selling 48 gram jumbo rolls." Id. at 30-31 (footnote omitted).  Accordingly, the Commission "conclude[d] that the subject imports from Germany did not have a significant adverse impact on the domestic industry as a whole during the [POI]." Id. at 36 (footnote omitted).

Nevertheless, the Commission determined that a threat of material injury did exist to the domestic industry by reason of the subject LWTP imports from Germany. Comm'n Final Determination, 73 Fed. Reg. at 70,367; but see Comm'n Views at 36 n.236 (noting that "Chairman Aranoff, Vice Chairman Pearson, and Commissioner Okun have made negative determinations on Germany and do not join the [threat of material injury portion] of this

opinion" (citation omitted)).  Specifically, the Commission found
that "a continuation of the gradual increase in subject import
volumes from Germany that occurred during the [POI] is likely in
the imminent future," Comm'n Views at 36, noting that "[w]hile
the German producers did not add any new LWTP production
facilities during this period, they were able to increase
capacity through a combination of achieving greater efficiencies
and using capacity previously devoted to producing other products
to produce LWTP instead," id. (citations omitted), and that
"[t]he record contains no indication that the German producers
cannot continue to increase capacity through such means in the
imminent future." Id. (footnote omitted).

Further, the Commission found that "[a]s the German
producers' capacity and shipments increased during the [POI],
their exports to the United States increased roughly
commensurately," id. at 37, and that this was "likely to continue
in the imminent future," id., because "[t]he United States was a
significant export market for the German producers during the
[POI], and the German producers project[ed] it [would] remain so
in the imminent future." Id. (citation omitted).  The Commission
noted that Koehler planned to open a new coating facility in the
United States that would not become operational until 2010, and
that this "provide[d] a further incentive for Koehler, [a

significant[6]] exporter of subject merchandise from Germany, to

continue to increase its presence in the U.S. market in the

imminent future while its projected U.S. facility is being

planned and constructed." Id. (citation and footnote omitted).[7]

Finally, the Commission determined that these "increased

subject imports from Germany that are likely in the imminent

future will have greater price effects than those observed during

the [POI]." Id.  It noted that "several considerations indicate

that imports entering in the imminent future will be heavily

---

[6] See Comm'n Views (Conf.) at 62 (characterizing Koehler as
"the [[          ]] exporter of subject merchandise from
Germany"). See also Comm'n Views at 37 (same).

[7] Chairman Aranoff, Vice Chairman Pearson, and Commissioner
Okun dissented, arguing that [[

                                                          ]]
Certain Lightweight Thermal Paper from China and Germany,
Confidential Dissenting Views of Chairman Aranoff, Comm'rs
Pearson & Okun, Admin. R. Con. Doc. 532, at 1.  The dissenters
noted that [[



          ]] Id. at 4.  They further argued that [[



                    ]] Id.

concentrated in the 48 gram product," id.,[8] and that, due to

Appleton's recent construction of a new facility[9] and

introduction of its own 48 gram product, "48 gram jumbo rolls

will increasingly be the focus of competition between [the like

domestic product and the subject imports from Germany]." Id.

at 38.  Accordingly, the Commission concluded that "the [sales

data for] German 48 gram jumbo rolls observed during the

[POI][10] will have far greater significance in the imminent

future." Id.; see also id. ("Because the record contains no

evidence that the [trend] observed during the [POI] with respect

to [48 gram LWTP] is likely to change, we conclude that it will

likely continue in the imminent future.") (footnote omitted).

So too the Commission found the domestic industry "vulnerable to

---

[8] See Comm'n Views at 37 (listing considerations including
the fact that "Koehler, which is the predominant exporter of
subject merchandise from Germany, discontinued its shipments of
its principal 55 gram product to the United States in March
2008"; that "interim 2008 U.S. shipments of subject German
imports of 48 gram jumbo rolls exceeded those of 55 gram jumbo
rolls"; and that "the 48 gram product has seen increasing
acceptance in the U.S. market").

[9] Appleton opened a new coating facility in West Carrollton,
Ohio ("the West Carrollton facility") on August 6, 2008, id.
at 15, which substantially increased domestic coating capacity.
Id. at 34.

[10] See Comm'n Views (Conf.) 64 ("[T]he [[
        ]] by German 48 gram jumbo rolls observed during the
[POI] will have far greater significance in the imminent
future.").

the effects of additional subject imports," id. at 39, because of
the "consistently unprofitable financial performance of the
domestic industry during the [POI]." Id.

    In determining the relevant domestic industry, in addition
to jumbo roll coaters, the Commission also included converters
within the scope of that domestic industry. Id. at 8.  The
Commission received questionnaire responses from twenty domestic
converters, estimated to account for 62.1 percent of domestic
LWTP conversion activities during the relevant period. Id. at 15.
The Commission noted that while both of the two domestic coaters
supported the petition for the imposition of an antidumping duty
order, twelve out of twenty converters opposed the imposition of
duties, and only three of these twenty supported the petition
with respect to Germany. Id. at 39 n.261.  The Commission
explained, however, that "[t]his is not especially surprising,
insofar as the subject producers supply, and do not compete with,
the U.S. converters," id., and that, "[i]n any event, the
positions of domestic producers in support or opposition to the
petition do[] not override [the Commission's] review of the
trade, pricing, financial data, and other information in the
record indicating whether the domestic industry is materially
injured or threatened with material injury by reason of the
subject imports." Id. (citing Certain Orange Juice from Brazil,

USITC Pub. 3930, Inv. No. 731-TA-1089 (Final) (Remand) (June 2007) at 14).

## STANDARD OF REVIEW

Where, as here, an action is brought under 19 U.S.C. § 1516a(a)(2) seeking review of a final determination of the Commission under 19 U.S.C. § 1673d, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

The substantial evidence standard of review "can be translated roughly to mean 'is [the determination] unreasonable?'" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (alteration in original) (quoting SSIH Equip. S.A. v. U. S. Int'l Trade Comm'n, 718 F.2d 365, 381 (Fed. Cir. 1983)).  The agency's decision must be supported by substantial evidence on the record as a whole, see generally Gerald Metals, Inc. v. United States, 132 F.3d 716 (Fed. Cir. 1997), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Thus, where only one reasonable conclusion can be drawn from the record, a determination contrary to that conclusion cannot be supported by substantial evidence. Gerald

<u>Metals</u>, 132 F.3d at 720-723.  On the other hand, the possibility
of drawing two inconsistent conclusions from the evidence does
not render the agency's determination unreasonable, <u>Consolo v.
Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966), and where
"[s]ubstantial evidence exists on both sides of the issue[,]
. . . the statutory substantial evidence standard compels
deference to the [agency]." <u>Nippon Steel</u>, 458 F.3d at 1354.

**DISCUSSION**

A.   <u>Relevant Domestic Industry Analysis</u>

     1.   *Purported Focus on Appleton*

     Plaintiffs first argue that the Commission unlawfully
"limited [its] threat analysis entirely [to] predictions of the
effect of future imports of 48-gram German jumbo rolls on one
producer, Appleton." (Mem. in Supp. of Pls.' Mot. for J. on
Agency R. Under Rule 56.2 ("Pls.' Mem.") 12 (citing <u>Comm'n Views
(Conf.)</u> at 63-64 [<u>Comm'n Views</u> at 38]).)[11]  In support of their
argument, Plaintiffs point to 19 U.S.C. § 1673(2)(A) (Commission
required to make determination with respect to "an industry in
the United States") and 19 U.S.C. § 1677(4)(A) (defining

_____

     [11] Plaintiffs claim that the Commission's analysis made no
mention of the subject imports' threatened impact on either the
other domestic coater, or the twenty converters included in the
scope of the Commission's industry determination. (Pls.' Mem. 13-
14; Reply in Supp. of Pls.' Mot. for J. on Agency R. Under Rule
56.2 ("Pls.' Reply") 2-4.)

"industry" as "the producers as a whole of a domestic like

product") (Pls.' Mem. 10), and the Commission's own determination

that the domestic industry "encompass[es] all converters and

coaters of LWTP" (id. at 12 (citing Comm'n Views (Conf.) at 15

[Comm'n Views at 10])).

The record before the court, however, does not support

Plaintiffs' argument.  Contrary to Plaintiffs' assertions, the

Commission did not focus exclusively on the effect of future

German imports of 48 gram LWTP on Appleton, but rather

consistently discussed its conclusions as to the effect of such

importation on the industry as a whole. See Comm'n Views at 38

("[T]he increased lower-priced imports of 48 gram jumbo rolls

from Germany that are likely in the imminent future . . . will

begin to have significant price effects on domestically produced

55 gram jumbo rolls."); id. ("[A]s 48 gram products become more

important in the U.S. market, the low prices German producers

offer on their 48 gram products will restrict the ability of

domestic producers to adjust prices on 55 gram products

commensurately with costs."); id. at 39[12] ("In light of the

consistently unprofitable financial performance of the domestic

---

[12] The court notes that, in addition to Appleton's 55 gram
product, "Kanzaki's [the other domestic coater] 53 gram product
is included in the tabulation for 55 gram products." Comm'n Views
at 16 n.107.

industry during the [POI], we find the industry to be vulnerable

to the effects of additional subject imports." (footnote

omitted)); see also id. 35 ("Overall domestic industry financial

performance declined from 2005 to 2007.  The combined operating

margin of coaters and converters was negative [throughout the

POI]." (citation and footnote omitted)).

     Moreover, it is within the Commission's discretion to place

greater weight on certain members of the domestic industry, in

proportion to their relative importance.  "[A]s legislative

history shows[,] . . . '[i]n making its injury determination, the

[Commission] may give greater weight to one or the other group

within the industry, in proportion to their relative importance,

if either group accounts for a significant portion of the total

value of the processed product.'" Tropicana Prods., Inc. v.

United States, 31 CIT __, __, 484 F. Supp. 2d 1330, 1341-42

(2007) (quoting S. Rep. No. 100-71, at 111 (1987)); see also

General Motors Corp. v. United States, 17 CIT 697, 703-06, 827 F.

Supp. 774, 782-83 (1993) (upholding the Commission's reliance on

data from a particular member of the industry when "the majority

did not disregard other data in the record, [and] emphasized that

it considered all the survey data").

     Weighing the evidence before it, the Commission determined

that 48 gram standard-sensitivity jumbo rolls will increasingly

be the focus of competition between German subject imports and

the domestic industry, <u>Comm'n Views</u> at 38, and that Appleton was

the sole domestic producer of such rolls. <u>See</u> <u>id.</u> at 16, 30, 36.[13]

Accordingly, where, as noted above, the Commission has emphasized

the likelihood of future injury to the domestic industry as a

whole, to the extent that the Commission also devoted substantial

discussion to Appleton, its placement of a particular emphasis on

the most significant domestic competitor was reasonable under the

circumstances.[14] <u>See</u> <u>Tropicana Prods.</u>, 31 CIT at __, 484 F. Supp.

----

[13] <u>See also</u> <u>Certain Lightweight Thermal Paper from China and Germany</u>, Confidential Staff Report to the Commission, Inv. Nos. 701-TA-451 and 731-TA-1126-1127 (Final) (Oct. 20, 2008), Admin. R. Con. Doc. 497 ("<u>Comm'n Final Staff Report (Conf.)</u>") V-11 n.26 (explaining that, [[



]]).  Conversely, German imports of such merchandise during the POI consisted of products from only two German producers. <u>See</u> <u>Comm'n Views</u> at 3, 16.

[14] (<u>See</u> Def.'s Mem. 24 ("Because, as Koehler acknowledged to the Commission, 'German imports do not compete with U.S. producers of slit rolls,' and there was no competition for sales between the German exporters and the U.S. converters, the Commission's analysis reasonably focused on the significant area of competition between the subject imports and the domestic industry." (quoting German Resp'ts' Prehr'g Br. (Final) (Sept. 22, 2008), Admin. Pub. R. Doc. 170, at 8)).)  Further, as Defendant-Intervenor points out, "Appleton's introduction of a 48 gram product in the fall of 2007 and its increasing capacity to produce 48 gram product with its construction of the New Carrollton facility was a pivotal difference between the injury analysis (based on data through June 2008) and the threat analysis (which considered the start-up of Appleton's new plant in August 2008)." (Def.-Intervenor's Mem. 16 (citing <u>Comm'n Views (Conf.)</u> at 24, 63-64 [<u>Comm'n Views</u> at 15, 38]).)

2d at 1341-42.

   *2.   Consideration of Domestic Industry Opposition*

   Plaintiffs also contend that the Commission acted contrary to law by disregarding twelve domestic converters' opposition to the petition, citing the court's ruling in <u>Suramerica de Aleaciones Laminadas, C.A. v. United States</u>, 17 CIT 146, 163, 818 F. Supp. 348, 364 (1993), <u>aff'd</u>, 44 F.3d 978, 986 (1994), for the proposition that "careful consideration of opposition to the petition by domestic producers is even more important in evaluating a threat case than in a present material injury analysis." (Pls.' Mem. 14; Pls.' Reply 6.)  Plaintiffs further argue that, because the Commission did not exclude any converter from consideration under the statute's related party provision,[15] the Commission cannot "ignore or reject the fact that German imports have either no effect or a positive effect on a large segment of the domestic industry." (Pls.' Reply 8-9 & n.4 (listing evidence in the record in support of its claim that "converters depend on German jumbo rolls of 48-gram as a vital input").)

_____

   [15] <u>See</u> 19 U.S.C. § 1677(4)(B)(i) ("If a producer of a domestic like product and an exporter or importer of the subject merchandise are related parties, or if a producer of the domestic like product is also an importer of the subject merchandise, the producer may, in appropriate circumstances, be excluded from the industry.").

There is, however, no statutory requirement that the Commission give dispositive weight to industry opposition to the petition in making its threat of material injury determination. See generally 19 U.S.C. §§ 1677(7)(B) & (F).  Although, "[i]n making a determination of threat of material injury, [the] ITC must *weigh* industry views and views of other interested parties, together with all other relevant economic factors as appropriate under the record of each particular investigation," Suramerica, 44 F.3d at 984 (emphasis added),[16] the Commission "may use its sound discretion in determining the weight to afford these and all other factors." Id at 984.  Further, "if the independent data clearly support a finding of threat of injury," then a threat of injury determination may be warranted "even where the majority [of the domestic industry] either does not support or actively opposes the initiating petition." Suramerica, 17 CIT at 163, 818 F. Supp. at 364.

---

[16] See also id. at 983-84 (explaining that 19 U.S.C. § 1677(7)(F)(i) "directs that [the] ITC 'shall' consider all relevant economic factors in a threat investigation," and that "[b]ecause the ITC must consider all 'relevant economic factors,' it must examine, beyond the factors specified in section 1677(7), any other factors that tend 'to make the existence of a [threat of material injury] more probable or less probable than it would be without the [factors]" (alteration in original) (quoting Fed. R. Evid. 401 (defining relevancy)) (additional citation omitted)).

Recognizing the ITC's authority to determine the weight of
evidence of industry support, Defendant-Intervenor correctly
points out that, when members of the domestic industry are viewed
proportionately, based on their total production values, a
majority of the domestic industry supported the petition.[17]

With respect to the opposing converters, the Commission
found that these members of the domestic industry are supplied
by, and are not in competition with, the subject imports, Comm'n
Views at 39 n.261, and that their opposition "does not override
[the Commission's] review of the trade, pricing, financial data,
and other information in the record," id., on the basis of which
Defendant made its affirmative threat of injury determination.
Accordingly, the Commission "properly considered and discounted
the opposition to the petition,"[18] and it is not the province of

_____

[17] (See Def.-Intervenor's Mem. 20 ("Both domestic coaters
and three converters supported the petition, and together they
represent [[                    ]] the LWTP production performed by
the domestic industry.  In addition to the three supporting
converters, [[

                              ]]." (citing Comm'n Views
(Conf.) at 13 n.46, 67 n.261 [Comm'n Views at 9 n.46, 39 n.261];
Comm'n Final Staff Report (Conf.) at III-3 Table III-1
(identifying each industry member's position on the petition),
III-5 Table III-2 (identifying coaters' production values), III-7
Table III-4 (identifying converters' production values), III-8
Table III-5 (identifying production values of supporting
converters))).)

[18] See Tropicana Prods., 31 CIT at __, 484 F. Supp. 2d at
1348 (explaining that in Citrosuco Paulista, S.A. v. United
States, 12 CIT 1196, 1216-17, 704 F. Supp. 1075, 1093 (1988),

this court to "reweigh the evidence or substitute its judgment

for that of the ITC." Goss Graphics, 22 CIT at 1008-09, 33 F.

Supp. 2d at 1104 (citations omitted).

B.   Consideration of 48 Gram Product Included in Commerce's
     Published Margin

     Next, Plaintiffs contend that the Commission erred by not

removing Koehler's 48 gram product from its threat of material

injury analysis, arguing that "Koehler submitted [to the

Commission] the record from the Commerce investigation showing

. . . that none of Koehler's 48-gram product was dumped" (Pls.'

Mem. 16 (emphasis omitted) (citing Papierfabrik August Koehler AG

& Koehler America, Inc. Post Hr'g Br. (Final), Admin. R. Con.

Doc. 490, at [6-7], Ex. H[19])) and that "it is vital that the

Commission consider whether [] the allegedly threatening subset

of imports were in fact being dumped." (Pls.' Mem. 17.)[20]   In

_____

"the Commission expressly found that the processors opposing the
petition were more dependent upon [subject] imports than those
supporting the petition," and that "[t]he court affirmed the
determination").

     [19] At oral argument, Plaintiffs' counsel informed the court
that the evidence allegedly showing that none of Koehler's
48 gram product was dumped is actually included in Koehler &
Mitsubishi HiTec Prehr'g Br. (Final), Admin. R. Con. Doc. 460,
Ex. 13.  This confusion further emphasizes the uncertainty with
regard to the factual basis underlying Plaintiffs' argument.

     [20] In making this argument, Koehler omits to note that the
exhibit it submitted was only for calculating an *estimated*
margin, see 19 U.S.C. § 1673d(c)(1)(B)(i)(I), for Koehler's sales
during Commerce's period of investigation. See Commerce Final

support of their argument, Plaintiffs point to the language of

the antidumping statute,[21] the legislative history to the Uruguay

Round Amendments Act,[22] the Federal Circuit's decision in <u>Gerald</u>

<u>Metals</u>, 132 F.3d 716,[23] the Commission's own policy of removing

from its analysis companies individually found to have had zero

---

<u>Determination</u>,73 Fed. Reg at 57,327.

[21] (<u>See</u> Pls.' Mem. 17-18 (quoting 19 U.S.C. § 1677(7)(F)(ii)
(characterizing the Commission's determination as "whether
further *dumped* or subsidized imports are imminent" (emphasis
added))).)  Plaintiffs argue that because "Congress included
specific language in one section of [the] law [19 U.S.C.
§ 1677(7)(F)(i)] but omitted it from another, related section of
the same law [19 U.S.C. § 1677(7)(F)(ii)]" (Pls.' Reply 13), the
court should "presume that the use of the term [d]umped imports
[in 19 U.S.C. § 1677(7)(F)(ii)] rather than [s]ubject imports was
deliberate." (<u>Id.</u>)  Because Congress could have said 'subject
imports' but said 'dumped imports,' Plaintiffs contend that
"Congress did not intend the term [dumped imports] to have the
same meaning as [s]ubject imports." (<u>Id.</u> at 14 (emphasis
omitted).)

[22] (<u>See</u> Pls.' Mem. 18 (quoting H.R. Rep. No. 103-826, pt. 1,
at 854 (1994) (excerpt from Statement of Administrative Action,
explaining that changes to the portion of the antidumping statute
dealing with determinations of threat of material injury were
made "to track more closely the language contained in Articles
3.7 and 15.7 of the [Uruguay Round] Agreements requiring that
*further dumped* or subsidized imports be 'imminent' and that
'material injury would occur' absent relief" (emphasis added)).)

[23] (<u>See</u> Pls.' Mem. 19 (quoting <u>Gerald Metals</u>, 132 F.3d at
723 ("[P]roper consideration of the effect of fairly-traded
imports on the domestic market . . . is also necessary to assess
whether the dumping duties are remedial rather than
punitive.")).)

or *de minimis* dumping margins,[24] as well as the Federal Circuit's decision in <u>Algoma Steel Corp. v. United States</u>, 865 F.2d 240 (Fed. Cir. 1989).[25]

As the court will explain below, however, because a reasonable reading of the record on this issue supports the Commission's factual conclusions, and because the legal framework within which those factual conclusions have been made is sufficiently clear and established, the court need not resolve any potential tension between the parties' competing legal positions on this issue.

First, the Commission is presumed to have considered all of the evidence before it. <u>See</u> <u>Gonzales v. West</u>, 218 F.3d 1378, 1381 (Fed. Cir. 2000) ("[A]bsent specific evidence indicating otherwise, all evidence contained in the record at the time of the [agency]'s determination . . . must be presumed to have been reviewed by [the agency], and no further proof of such review is

---

[24] (<u>See</u> Pls.' Mem. 20 (citing <u>Wooden Bedroom Furniture from China</u>, USITC Pub. 3743, Inv. No. 731-TA-1058 (Final) (Dec. 2004), at IV-18 Table IV-8; <u>Certain Cut-to-Length Steel Plate from France, India, Indonesia, Italy, Japan, and Korea</u>, USITC Pub. 3273, Inv. Nos. 701-TA-387-391 (Final) and 731-TA-816-821 (Final) (Jan. 2000), at 22 n.122).)

[25] (<u>See</u> Pls.' Mem. 21 (citing <u>Algoma Steel</u>, 865 F.2d at 242-43 (explaining that "there is no *per se* rule either way" with respect to the issue of whether the Commission must consider a computer printout from Commerce showing that only half of a company's individual sales were at LTVF).)

needed." (citations omitted)); <u>Suramerica</u>, 17 CIT at 164, 818 F.

Supp. at 365 (quoting <u>Rhone Poulenc, S.A. v United States</u>, 8 CIT

47, 55, 592 F. Supp. 1318, 1326 (1984)).  The Commission's

decision not to give more weight to the Plaintiffs' particular

piece of evidence, in light of Commerce's finding of dumping for

the class of Plaintiffs' merchandise, was not unreasonable on the

record here. <u>Accord</u> <u>Algoma Steel</u>, 865 F.2d at 242 ("[I]t is not

arbitrary, capricious, or contrary to law for the ITC to refuse

to consider a computer printout showing the breakdown of

[specific] sales during a six-month period between LTFV and [more

than fair value] sales ['MTFV'].").

     The <u>Algoma Steel</u> court also opined that "[t]his is not to

say that a similar printout might not justify consideration if

the raw data were supported by reasons specific to the particular

case, why sales at MTFV were not relevant to the injury

determination." <u>Id</u>.  But Plaintiff makes no demonstration of

reasons specific to this case why the alleged MTFV sales are not

relevant here.  To the contrary.  Here the agency concluded, as

noted above, that Plaintiff's "lower-priced imports of 48 gram

jumbo rolls . . . will begin to have significant price effects on

domestically produced 55 gram jumbo rolls." <u>Comm'n Views</u> at 38.

Plaintiff does not challenge this conclusion.  Thus, contrary to

Plaintiff's claim, the 48 gram jumbo rolls are directly relevant

to the ITC's finding of a threat of material injury.

Second, the problem with Plaintiffs' legal argument is that the statute requires that the Commission's threat of material injury determination must be based on a finding that the threat to relevant domestic industry is by reason of imports "*of the subject merchandise.*" 19 U.S.C. § 1677(7)(F)(i) (emphasis added).[26] The statute defines "subject merchandise" as "the class or kind of merchandise that is within the scope of an investigation[] . . . ." 19 U.S.C. § 1677(25). "The ITC may not modify the class or kind of imported merchandise examined by

---

[26] Plaintiffs are correct in interpreting the antidumping statute to require the Commission, in an appropriate case, to differentiate between dumped and fairly traded merchandise. See Bratsk Aluminium Smelter v. United States, 444 F.3d 1369, 1373 (Fed. Cir. 2006); Gerald Metals, 132 F.3d at 723. This, however, is not such a case. The issue presented here differs from that addressed by the Federal Circuit in Bratsk, where the court held that "[w]here commodity products are at issue and fairly traded, price competitive, *non-subject* imports are in the market, the Commission must explain why the elimination of subject imports would benefit the domestic industry instead of resulting in the non-subject imports' replacement of the subject imports' market share without any beneficial impact on domestic producers." Bratsk, 444 F.3d at 1373 (emphasis added). In this case, there were no fairly traded non-subject imports competing with the relevant domestic products: "During the [POI], the domestic industry and the subject imports supplied virtually the entire U.S. LWTP market. . . . [T]he domestic industry supplies both jumbo rolls and slit rolls of LWTP, subject imports from China are exclusively slit rolls, and subject imports from Germany are exclusively jumbo rolls." Comm'n Views at 16. See also Comm'n Views (Conf.) at 25 ("Nonsubject imports supplied a very small share of the market, never accounting for more than [[    ]] percent of apparent U.S. consumption at any point during the [POI].").

Commerce." USEC Inc. v. United States, 34 F. App'x 725, 730 (Fed.

Cir. 2002); see also Algoma Steel Corp. v. United States, 12 CIT

518, 522, 688 F. Supp. 639, 644 (1988) ("In applying [the

antidumping] statute, ITC does not look behind [Commerce]'s

determination, but accepts [Commerce]'s determination as to which

merchandise is in the class of merchandise sold at LTFV."), aff'd

865 F.2d 240 (Fed. Cir. 1989); Nippon Steel, 458 F.3d at 1350

("Congress created a highly specialized system for resolving

antidumping allegations, which recognizes and exploits each

participant's area of expertise.").

        By statute, therefore, the Commission is required to make a

determination of whether an industry in the United States is

threatened with material injury "by reason of imports . . . of

the merchandise with respect to which [Commerce] has made an

affirmative determination under [19 U.S.C. § 1673d(a)(1)]."

19 U.S.C. § 1673d(b)(1).  For purposes of this section, a

"determination" of Commerce under section 1673d(a)(1) is the

final determination published in the Federal Register. See id.

§ 1673d(d).

        In this case, the Department of Commerce, exercising its

authority under 19 U.S.C. § 1673d(a)(1), "determined that imports

of [LWTP] from Germany are being, or are likely to be, sold in

the United States at [LFTV]." Commerce Final Determination,

73 Fed. Reg. at 57,326.  Commerce did not differentiate among the various products included within the scope of the subject merchandise – LWTP – and published a single weighted-average dumping margin for the entire class.  Id. at 57,327-28.  Indeed, the Department specifically stated that:

> As [Commerce's] final determination is affirmative and in accordance with section 735(b)(2) of the Act [19 U.S.C. § 1673d(b)(2)], the ITC will determine . . . whether the domestic industry in the United States is . . . threatened with material injury, by reason of imports or sales (or the likelihood of sales) for *importation of the subject merchandise*.  If the ITC determines that such injury does exist, the Department will issue an antidumping duty order directing [United States Customs and Border Protection] to assess antidumping duties *on all imports of the subject merchandise* . . . .

Id. at 57,328 (emphasis added).

Accordingly, contrary to Plaintiffs' assertions, the Commission properly included all merchandise within the class of merchandise determined by Commerce to have been sold at LTFV within the scope of its threat of material injury determination. Accord Algoma Steel, 12 CIT at 522, 688 F. Supp. at 644.[27]

---

[27] See also Sony Corp. of Am. v. United States, 13 CIT 353, 360, 712 F. Supp. 978, 984 (1989) ("Because [the relevant] imports were part of the class or kind of merchandise for which Commerce had made an affirmative determination, the Commission was required to include such imports in its injury investigation. As noted in Algoma[,] . . . in applying 19 U.S.C. § 1673 ITC does not look behind [Commerce]'s determination as to which merchandise is in the class of merchandise sold at LTFV." (alteration and quotation marks and citation omitted)); USEC, Inc. v. United States, 25 CIT 49, 56, 132 F. Supp. 2d 1, 8 (2001)

Plaintiffs place significant weight upon the evidence that they claim shows that some particular subset of sales were found by Commerce not to have been dumped.  However, as Defendant points out, if Commerce's final weighted-average dumping margin for the entire class of subject merchandise may be too high for some set of sales, it is conversely too low for others.[28] Accord Algoma Steel, 865 F.2d at 241 ("Commerce, determining that sales at LTFV have occurred, normally . . .  states a 'dumping margin' which is a weighted average adjusting appropriately for the MTFV sales.").  Moreover, Plaintiffs' argument seeks to isolate one alleged component of the data from Commerce's record, ignoring the other factors that contribute to Commerce's affirmative dumping determination with respect to the entire class of subject imports.

The thrust of Plaintiffs' argument appears to be that Koehler's 48 gram product should have been excluded from

(quoting Algoma for proposition that the Commission does not look behind Commerce's determination as to which merchandise is in the class of merchandise sold at LTFV); Goss Graphics, 22 CIT at 995, 33 F. Supp. 2d at 1093 (same).

[28] (See Def.'s Mem. 18 n.8 ("[A]s a logical matter, accepting Koehler's argument that imports in discrete non-dumped transactions are 'fairly traded' would change the margin for the remaining imports, those Koehler presumably deems to be 'dumped.' The applicable margin for the imports Koehler would deem to be 'dumped' would be higher than the margin published by Commerce. (This is because the amount of dumping would be no lower, but the volume of imports in dumping transactions would be reduced.)").)

Commerce's dumping determination, but if Plaintiffs believed that

the assessed 6.5% dumping margin failed to accurately reflect

their pricing practices, or that 48 gram LWTP should have been

excluded from the scope of subject merchandise, this is a matter

that should have been taken up in a challenge of that

determination under 19 U.S.C. § 1516a(a)(2)(B)(i).  Plaintiffs

have failed to do so,[29] and the Commission did not err in

considering within the scope of its threat of material injury

determination the entire class of subject merchandise for which

Commerce published an affirmative dumping determination.[30]

_____

[29] 19 U.S.C. § 1516a(a)(2)(A)(i)(II) requires that such
challenge be brought within thirty days of the date of
publication of the antidumping duty order in the Federal
Register.  Plaintiffs have missed that deadline.

[30] Because the case law and past Commission practice cited
to by Plaintiffs in support of their arguments on this issue all
involved situations where, unlike here, Commerce published zero
or *de minimis* margins, they do not affect the analysis in this
case.  The court notes that there is no tension between the
Commission's practice of excluding companies for which Commerce
has published zero or *de minimis* margins from its injury analysis
and the Commission's position that it is not required to look
behind Commerce's final dumping determination in this case –
where, unlike here, Commerce itself has published zero or *de
minimis* margins as part of its final determination, the
Commission may exclude such companies from its investigation
without supplanting Commerce's own analysis.
     Neither is the court's reasoning affected by, as Plaintiffs
suggest, recasting the inquiry as one of causation. (See Pls.'
Reply 10.)  The requirement that the Commission provide a showing
of causal connection between the LTFV merchandise and the threat
of injury is derived from language in the statute mandating that
the threat be "by reason of imports . . . of the merchandise with
respect to which [Commerce] has made an affirmative determination

C.    Likelihood of Increase in German LWTP Imports

    1.    *Determination of Likely Further Product-Shifting*

        Plaintiffs next argue that the Commission relied on

conclusions based on mere conjecture or supposition in making its

determination that German producers are likely to increase

imports to the United States in the immediate future. (Pls.' Mem.

26-31; Pls.' Reply 18-23.)  Plaintiffs argue that the

Commission's extrapolation of trends observed during the POI –

when German producers "were able to increase capacity through a

combination of achieving greater efficiencies and using capacity

previously devoted to producing other products to produce LWTP

instead," Comm'n Views at 36 – was not supported by substantial

evidence.  Plaintiffs contend that "[t]he German producers'

inability to prove the negative [*i.e.*, that trends observed

during the POI would not continue] . . . does not constitute

substantial evidence on the record." (Pls.' Mem. 27.)

        Contrary to Plaintiffs' assertions, however, the Commission

properly considered the potential for product-shifting as part of

its determination with respect to the likelihood of increased

subject imports, see 19 U.S.C. § 1677(7)(F)(i)(VI) (listing "the

potential for product-shifting" among factors that the Commission

_____

under [19 U.S.C. § 1673d(a)(1)]," 19 U.S.C. § 1673d(b)(1); see
Gerald Metals, 132 F.3d at 720 – in this case, the entire class
of subject merchandise.

is required to consider in its threat of material injury

analysis), and properly employed a 'trend' analysis to

extrapolate to the near future trends observed during the POI.

See Asociacion de Productores de Salmon y Trucha de Chile AG v.

U.S. Int'l Trade Comm'n, 26 CIT 29, 38, 180 F. Supp. 2d 1360,

1370 (2002) ("The Court of International Trade has previously

approved such a 'trend' analysis as reasonable." (citing Bando

Chemical Industries, Ltd. v. United States, 17 CIT 798, 807

(1993), aff'd, 26 F.3d 139 (Fed. Cir. 1994); Iwatsu Elec. Co. v.

United States, 15 CIT 44, 55, 758 F. Supp. 1506, 1515-16

(1991))).  The record as a whole demonstrates that product-

shifting in fact occurred to a significant degree during the POI,

Comm'n Views at 36, whereas, as the Commission pointed out,

"[t]he record contains no indication that the German producers

cannot continue to increase capacity through such means in the

imminent future." Id.

Again, "[b]ecause of th[eir] expertise, Commissioners are

the factfinders in the material injury determination: 'It is the

Commission's task to evaluate the evidence it collects during its

investigation.'" Nippon Steel, 458 F.3d at 1350 (quoting U.S.

Steel Group v. United States, 96 F.3d 1352, 1357 (Fed. Cir.

1996)).  On the record before the court, the Commission's

projections based on product-shifting trends observed during the

POI are reasonable.

  2.   *Effect of Appleton's New West Carrollton Facility*

     Plaintiffs also contend that the Commission's determination
of a likely increase in German subject imports "is further
contradicted by substantial evidence on the record showing that
product entering the market from Appleton's new West Carrollton
facility will result in increased U.S. shipments and decreased
German shipments." (Pls.' Mem. 27.)  Plaintiffs argue that the
Commission "implicitly conclude[d], without any basis, that
German producers would continue an endless upward trajectory in
exports to the United States in the face of not only a projected
slowdown in U.S. demand, but also a [significant] increase in
Appleton's coating capacity." (Id. 30.)

     Again, the Commission is presumed to have considered all of
the evidence before it. Gonzales, 218 F.3d at 1381; Suramerica,
17 CIT at 164, 818 F. Supp. at 365.  Further, as reflected in the
Commission's extensive discussion of Appleton's new West
Carrollton facility throughout its opinion, as well as the
crucial role played by this factor in supporting the Commission's
affirmative threat of injury determination, notwithstanding its
negative present injury determination, see Comm'n Views at 38-39,
it is clear that the Commission considered the effect of this new
facility in reaching its conclusions.

As noted above, unless the presence of this evidence in the record creates a situation where only one reasonable conclusion can be drawn, <u>see</u> <u>Gerald Metals</u>, 132 F.3d at 720, the fact that Plaintiffs can interpret the evidence in a way contrary to the interpretation reached by the Commission does not make the Commission's determination unsupported by substantial evidence. <u>See</u> <u>Consolo</u>, 383 U.S. at 620; <u>Matsushita Elec. Indus. Co. v. United States</u>, 750 F.2d 927, 936 (Fed. Cir. 1984).  Here, a reasonable reading of the record permits the conclusion that the product-shifting trends experienced during the POI were likely to continue in the near future and that these trends would not be negated by Appleton's increased capacity at West Carrollton, because the new facility's effect on domestic production would be moderated.[31]  The record also evidences that demand would continue to grow. <u>See</u> <u>Comm'n Views</u> at 14-15.  Accordingly, the record does not point to only one reasonable conclusion, and it is once more not the province of this court to re-weigh the evidence that the Commission alone is, in its expertise, entrusted to consider and

---

[31] (<u>See</u> Def.'s Mem. 36 ("Koehler mistakenly assumes that Appleton's capacity would increase commensurately with the increase in capacity at West Carrollton.  In fact, Appleton planned to [[
                                                    ]]."(citing Appleton Papers Inc. U.S. Producers' Questionnaire (Final), Admin. R. Con. Doc. 367 ("Appleton Questionnaire"), Ex. [1] at 45-46)).)

weigh. See Nippon Steel, 458 F.3d at 1350.

    3.   *Effect of Koehler's Plan to Open a New U.S. Facility in
         2010*

    Finally, Plaintiffs contend in this regard that the

Commission's conclusion that Koehler's plans to open a new

coating facility in the United States in 2010 provide an added

incentive for Koehler to increase its presence in the U.S. market

in the interim (*i.e.*, imminent future) is also based on

conjecture. (Pls.' Mem. 30.)  Plaintiffs argue that the

Commission "provide[s] not a shred of support in the record for

this assumption, and indeed it is contradicted by Koehler's own

business plans, and rendered highly implausible by the massive

increase in capacity that came online in August 2008 from

Appleton's West Carrollton facility." (Id. 30-31.)

    Defendant responds that the Commission's decision not to

rely on Koehler's own business plans was within the Commission's

discretion. (Def.'s Mem. 30.)[32]  In supporting its decision to

---

    [32] The Defendant cites Salmon y Trucha, 26 CIT at 37-38,
180 F. Supp. 2d at 1370 (Commission acted reasonably in not
relying principally on data furnished by respondents projecting
capacity declines); Companhia Paulista de Ferro-Ligas v. United
States, 20 CIT 473, 484-85 (1996) (Commissioner acted reasonably
by not relying on respondent's projections when they were
inconsistent with historical pattern of conduct and could not be
reconciled with other evidence)). (Def.'s Mem. 30-31.) See also
Def.-Intervenor's Mem. 23 (citing Geo Specialty Chems., Inc. v.
United States, No. 08-00046, 2009 WL 424468, at *6 (CIT Feb. 19,
2009) (approving the Commission's rejection of "foreign
producers' projections that imports would decrease").

disregard Plaintiffs' projections, Defendant points to what it
perceived as internal inconsistencies within Koehler's business
plan.[33]  Further, Defendant notes that "Koehler's business plan
attributed likely export declines in part to a consideration
whose importance a Koehler official downplayed in sworn testimony
[before the Commission]" (<u>id.</u> 32), and that this "also provided a
basis for [the] Commission's decision not to give weight to the
projected declines." (<u>Id.</u>)  Thus, Defendant argues that:

> the Commission reasonably concluded that Koehler would
> not voluntarily retreat from the U.S. market during the
> year it was building its new facility, thereby
> surrendering market share to Appleton.  To the
> contrary, the Commission's conclusion that Koehler's
> projected U.S. facility provided it with an incentive
> to increase its presence in the U.S. market was
> entirely consistent with the thrust of the Koehler
> business plan.

(<u>Id.</u> 31.)

Defendant-Intervenor further argues that "the incentive to

---

[33] (<u>See</u> Def.'s Mem. 31 ("On the one hand, [Koehler]
projected [[                                              ]].
On the other, it [[


                                        ]]." (citing
Papierfabrik August Koehler AG Foreign Producers' Questionnaire,
Admin. R. Con. Doc. 525, Attach. 3 at 6, 10)); <u>see also</u> Def.-
Intervernor's Mem. 24 (noting that while Koehler asserted that
"'it had [[                ]],' [] the Commission observed that
Koehler [[

                                        ]]." (quoting
<u>Comm'n Views (Conf.)</u> at 61 n.239)).)

build customer relationships and product acceptance in advance of constructing a production facility is a reasonable presumption." (Def.-Intervenor's Mem. 27 (quoting Nippon Steel Corp. v. United States, 19 CIT 450, 480 (1995) ("Once purchasers have an established supply relationship, the established supplier has an advantage, and the competing supplier is forced to beat the import price, probably by a substantial margin.")).)

With respect to this issue, Plaintiffs again essentially ask the court to re-weigh the evidence before the Commission, which the court must again decline to do. As noted above, the Commission reasonably concluded, based on the record before it that, in light of trends experienced during the POI, subject German imports are likely to continue to increase in the immediate future. Because it is not unreasonable for the Commission to have concluded "that Koehler would not voluntarily retreat from the U.S. market during the year it was building its new facility" (Def.'s Mem. 31), the court cannot agree that Plaintiffs' interpretation of the effect of Koehler's plans to open a new U.S. facility is the only reasonable interpretation. See Gerald Metals, 132 F.3d at 720. Accordingly, the court cannot agree that the Commission's determination is unsupported by substantial evidence.

D.    Likely Price Effects Determination

     The Commission generally defends its determination of likely
price effects as based on two unchallenged findings.  First, the
Commission determined that the 48 gram product, as opposed to the
55 gram product, "would be the focus of competition between the
domestic like product and the subject imports in the imminent
future" (Def.'s Mem. 33); see also Comm'n Views at 38, and,
second, that "the subject imports from Germany [tended to
undersell] the domestically produced 48 gram product during the
[POI]." (Def.'s Mem. 33.)[34]  Defendant explains that "[t]he
Commission consequently concluded that the [price differential]
observed for the 48 gram product during the [POI] was likely to
continue in the imminent future, and that it would impede the
domestic industry's attempts to gain or maintain sales of that
product." (Id.)

     Plaintiffs maintain that the Commission should have instead
concluded that, regardless of any price effects from increased
subject imports from Germany, Appleton would lower its prices, as
purportedly evidenced by (1) Appleton's business plan, and (2)

_____

     [34] (See Def.'s Mem. 33 (noting that subject imports from
Germany "[[                    ]] the domestically produced 48
gram product during the [POI]); see also Comm'n Views (Conf.) at
53 ("The [48 gram] subject imports [from Germany] undersold the
domestically produced product in [[       ]] quarterly
comparisons." (citation omitted)).)

basic laws of supply and demand.  The court will consider each of these arguments in turn.

> 1.   *Likelihood of Lower Domestic Prices Based on Appleton's Business Plan*

Plaintiffs first argue that the Commission's finding of likely price effects is unsupported by substantial evidence by asserting that the Commission unreasonably failed to conclude from the record that Appleton's new West Carrollton facility was intended to allow Appleton to cut its prices on 48 gram LWTP, thereby preempting any price effects from cheaper German products. (See Pls.' Mem. 31-33.)  Specifically, Plaintiffs contend that Appleton's business plan, "the only contemporaneous documentation provided regarding the [West Carrollton] investment decision (*i.e.*, that was not prepared in the context of the investigation)" (Pls.' Mem. 32) supports the conclusion that Appleton intended to cut prices once the new facility was up and running.[35]

---

[35] (See Pls.' Mem. 33 ("[[





]]" (emphasis omitted)).)

Defendant contests Plaintiffs' interpretation of Appleton's business plan,[36] and argues that the Commission's alternative reading of this plan "was consistent with the public testimony of Appleton's Chief Executive Officer that Appleton's decision to invest in its West Carrollton's facilities was based on the pricing and demand conditions that existed when the investment decision was made in 2006, and that subsequent pricing declines imperiled that investment." (Def.'s Mem. 35 (citing Transcript of Open Session of Comm'n Hr'g held on Oct. 2, 2008 (Revised and Corrected Copy), Admin. R. Pub. Doc. 258, at 58-60).)  Finally, Defendant asserts that Plaintiffs "point[] to nothing in the record indicating that Appleton was making any profit from LWTP production at its [n]ew [West] Carrollton facility, much less that its production was so profitable that it would have an

_____

[36] (See Def.'s Mem. 35 ("The Commission found, and Koehler concedes, that the Appleton business plan projected [[

]].  The Commission further found, and Koehler does not contest, that the prices Appleton charged for the [[


]].  Consequently, Appleton's projections in its business plan [[
]], than the most recent prices in the record before the Commission." (citing Comm'n Views (Conf.) at 65 n.257; Appleton Questionnaire, Ex. [1] at 43; Pls.' Mem. 33)).)

incentive to cut prices." (<u>Id.</u> at 35-36 (emphasis omitted)).[37]

The Defendant is correct.  There is nothing manifestly unreasonable about the Commission's reading of Appleton's business plan and its reliance on testimony from Appleton's Chief Executive Officer.  The Commission's reasoning with respect to its likely price effects determination – that, unlike the situation during the POI, the 48 gram product rather than the 55 gram product will be the focus of competition between subject German imports and domestic producers, and that, given trends seen during the POI, the 48 gram product from Germany will likely undersell domestically produced 48 gram product, see <u>Comm'n Views</u> at 32, 37-39 – is also not unreasonable on the evidence before it.

2.  *Likelihood of Lower Domestic Prices Based on Increased Domestic Supply*

In support of their challenge to the Commission's finding of likely price effects, Plaintiffs further argue that basic economic principles of supply and demand also support a conclusion from the record that Appleton would cut prices after opening its new facility. (Pls.'s Mem. 33-36.)  Plaintiffs note

---

[37] (<u>See also</u> <u>id.</u> at 36 (noting that "[t]he record[] . . . indicates that Appleton had [[                    ]] in 2006 on LWTP operations."(citing <u>Comm'n Final Staff Report (Conf.)</u> at VI-5-6; <u>Certain Lightweight Thermal Paper from China and Germany</u>, Verification Report, Inv. Nos. 701-TA-451 and 731-TA-1126-1127 (Final) (Oct. 7, 2008), Admin. R. Con. Doc. 486)).)

that the Commission acknowledged Appleton's projection that its
new facility "will increase its capacity of the subject product"
(id. 31 (quoting Comm'n Final Staff Report (Conf.) at III-4)) and
argue that "businesses simply do not spend $125 million to
increase capacity by [a significant] percent[age] without using
it" (id. 34), and that the resulting increase in quantity of the
48 gram product to be supplied to the market once Appleton's new
facility is fully operational will naturally lower the market
equilibrium price, provided demand remains relatively unchanged.
(Id. 34-35.)

The record, however, does not require the conclusion that an
increase in domestic supply will negate the effect of German
underselling.  Rather, available domestic supply is just one
factor in the Commission's analysis, and it must be weighed
against the undisputed evidence of underselling by the German
producers.  In addition, as mentioned above, the record
demonstrates that Appleton's lack of profitability will militate
against price cuts.  Contrary to Plaintiffs' contention,
therefore, basic principles of supply and demand do not make the
Commission's likely price effects determination unreasonable, and
the court concludes that this determination is supported by
substantial evidence. See Nippon Steel, 458 F.3d at 1351.

E.   Vulnerability of Domestic Industry

Finally, Plaintiffs argue that the Commission's conclusion that the domestic industry is vulnerable to the likely impact of additional subject imports – based on the Commission's finding regarding "the consistently unprofitable financial performance of the domestic industry during the [POI]" (Pls.' Mem. 36 (quoting Comm'n Views at 39)) – is also unsupported by sufficient evidence.  Plaintiffs once more in effect request the court to re-weigh the evidence that the Commission alone is authorized and entrusted to gather, consider, and weigh in coming to its threat of injury determination. (See id. 36-38.)

As evidenced by the citations supplied in its Views, the Commission's finding that "[o]verall domestic industry financial performance declined [during the POI]" is supported by substantial evidence. See Comm'n Views at 26. (See also Def.'s Mem. 37-38 ("An examination of the combined operations of all U.S. coaters and converters of LWTP demonstrates [that] . . . [c]oaters and converters combined had operating losses of $1.0 million in 2005, $93,000 in 2006, $11.2 million in 2007, $3.6 million in interim 2007, and $6.5 million in interim 2008,"(citing Comm'n Final Staff Report (Conf.) at VI-4 Table VI-3)).)  Accordingly, the Commission's finding that "[i]n light of the consistently unprofitable financial performance of the

domestic industry during the [POI], . . . the industry [is] vulnerable to the effects of additional subject imports," <u>Comm'n Views</u> at 39 (footnote omitted), is also supported by substantial evidence, particularly as the record does not indicate that trends observed during the POI are likely to change in the immediate future.

## CONCLUSION

For all of the foregoing reasons, the Commission's final determination that a domestic industry is threatened with material injury by reason of LWTP imports from Germany is supported by substantial evidence. Plaintiffs' Motion for Judgment on the Agency Record is therefore DENIED, and the Commission's determination is AFFIRMED in all respects.  Judgment will issue for the Defendants.

 <u>/s/ Donald C. Pogue  </u>
Donald C. Pogue, Judge

Dated:    November 17, 2009
          New York, N.Y.

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PAPIERFABRIK AUGUST KOEHLER AG and KOEHLER AMERICA,INC., | |
| Plaintiffs, | |
| – and – | |
| MITSUBISHI INTERNATIONAL CORPORATION, MITSUBISHI HiTECH PAPER FLENSBURG GmbH, and MITSUBISHI HiTECH PAPER BIELEFELD GmbH, | Before: Pogue, Judge Court No. 08-00430 |
| Plaintiff-Intervenors, | |
| v. | |
| UNITED STATES and the UNITED STATES INTERNATIONAL TRADE COMMISSION, | |
| Defendants, | |
| – and – | |
| APPLETON PAPERS INC., | |
| Defendant-Intervenor. | |

## **JUDGMENT**

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that Plaintiffs' Motion for Judgement on the Agency Record Under Rule 56.2 is DENIED; and it is further

ORDERED, ADJUDGED and DECREED that the International Trade Commission's determinations with respect to Germany in <u>Certain</u>

<u>Lightweight Thermal Paper from China and Germany</u>,

73 Fed. Reg. 70,367 (ITC Nov. 20, 2008)(final determinations) are

AFFIRMED.


                                          /s/ Donald C. Pogue
                                        Donald C. Pogue, Judge

Dated:     November 17, 2009
           New York, N.Y.

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____        By: _____
                                              Deputy Clerk