SLIP OP 12- 5

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PAPIERFABRIK AUGUST KOEHLER AG and KOEHLER AMERICA, INC., | |
| Plaintiffs, | |
| - and - | |
| MITSUBISHI INT'L CORP., MITSUBISHI HI-TEC PAPER FLENSBURG GmbH, and MITSUBISHI HI-TEC PAPER BIELEFELD GmbH, | |
| Plaintiff-Intervenors, | Before: Donald C.Pogue, Chief Judge Court No. 08-00430 |
| v. | |
| THE UNITED STATES and the UNITED STATES INTERNATIONAL TRADE COMMISSION, | |
| Defendants, | |
| - and - | |
| APPLETON PAPERS INC., | |
| Defendant-Intervenor. | |

**OPINION**

[Commission's remand determination affirmed.]

Dated: January 10, 2012

William Silverman and Richard P. Ferrin, Drinker Biddle & Reath LLP, of Washington, DC,  for the Plaintiffs,

Eric C. Emerson and Jamie B. Beaber, Steptoe & Johnson LLP, of Washington, DC, for the Plaintiff-Intervenors,

David F. D'Alessandris, Trial Attorney, Commercial

Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendants.  With him on the briefs were <u>Tony West</u>, Assistant Attorney General; <u>Jeanne E. Davidson</u>, Director; and <u>Patricia M. McCarthy</u>, Assistant Director.

Marc A. Bernstein, Office of General Counsel, United States International Trade Commission, of Washington, DC, for Defendant United States International Trade Commission.  With him on the briefs were <u>James M. Lyons</u>, General Counsel, and <u>Neal J. Reynolds</u>, Assistant General Counsel for Litigation.

<u>Joseph W. Dorn</u>, <u>Gilbert B. Kaplan</u>, <u>Brian E. McGill</u>, and <u>Daniel L. Schneiderman</u>, King & Spalding LLP, of Washington, DC, for the Defendant-Intervenors.

**Pogue, Chief Judge**:  This case returns to court following remand ordered by the Court of Appeals for the Federal Circuit in <u>Papierfabrik August Koehler AG v. United States</u>, 413 F. App'x. 227 (Fed. Cir. 2011) ("<u>Koehler II</u>").[1]  On remand, the International Trade Commission (the "ITC" or "Commission") found – after obtaining and taking into consideration intermediate calculation worksheets from the Department of Commerce showing that a specific subset of lightweight thermal paper ("LWTP") was not dumped on the United States market – that the domestic LWTP industry is still threatened with material injury by way of subject imports from Germany.

Plaintiffs ("Koehler") challenge the Commission's remand determination.  The court has jurisdiction pursuant to 28 U.S.C.

---

[1] <u>Koehler II</u> vacated and remanded this court's previous judgment.  <u>See</u> <u>Papierfabrik August Koehler AG v. United States</u>, __ CIT __, 675 F. Supp. 2d 1172 (2009) ("<u>Koehler I</u>").

§ 1581(c).

After a brief discussion of the background and applicable standard of review, the court will explain why it concludes that the Commission's remand determination is free of legal error and based on a reasonable reading of the record.

### BACKGROUND

In October, 2008, the Department of Commerce ("the Department" or "Commerce") issued a finding that imports of LWTP from Germany were being or were likely to be sold in the United States at less than fair value.  <u>Lightweight Thermal Paper from Germany</u>, 73 Fed. Reg. 57,326 (Dep't Commerce Oct. 2, 2008) (notice of final determination of sales at less than fair value) ("<u>Commerce Final Determination</u>").[2]  Shortly thereafter, pursuant to 19 U.S.C. § 1673d(b), the Commission conducted a separate injury investigation and determined that the domestic LWTP industry was threatened with material injury by way of imports from  Germany, including imports from Plaintiffs.  <u>Certain Lightweight Thermal Paper from China and Germany</u>, 73 Fed. Reg.

---

[2] Commerce defined the LWTP subject merchandise as "thermal paper with a basis weight of 70 grams per square meter . . . or less."  <u>Commerce Final Determination</u>, 73 Fed. Reg. at 57,327.
Koehler was a mandatory respondent in Commerce's investigation, <u>Id.</u> at 57,327 n.4. In its investigation, Commerce found that imports of the subject merchandise from Koehler were being dumped at a margin of 6.50 percent.  <u>Id.</u> at 57,328.

70,367 (ITC Nov. 20, 2008) (final determinations).[3]

LWTP is sold in a variety of weights, including 48 grams per square meter ("48g LWTP") and 55 grams per square meter ("55g LWTP"), which, together, comprise the bulk of LWTP sold in the United States.  ITC Original Determination, USITC Pub. 4043 at 16.  During the Commission's period of investigation, domestic production of LWTP was "overwhelmingly concentrated" in 55g LWTP. Remand Results 23, Sept. 30, 2011, ECF No. 123 (citing ITC Original Determination, USITC Pub. 4043 at 16).  Similarly, the majority of imported LWTP during the same time period was 55g.[4] ITC Original Determination, USITC Pub. 4043 at 16.  However, the Commission also found that domestic production of 48g LWTP was highly likely to increase in the future.  Id. at 38, 42. Likewise, German producers, including Plaintiffs, reported increased imports of 48g LWTP as a "significant change in product range" during the pertinent time period.  Id. at 17.

During the original ITC proceedings, Plaintiffs argued that a series of worksheets from Commerce's investigation showed that

---

[3] The views of the Commission are contained in Certain Lightweight Thermal Paper from China and Germany, USITC Pub. 4043, Inv. Nos. 701-TA-451 & 731-TA-1126-1127 (Final) (Nov. 2008), Admin. R. Pub. Doc. 285 ("ITC Original Determination").

[4] The Commerce period of investigation was from July 1, 2006 through June 30, 2007.  The ITC's threat analysis, however, focused on the imminent future after October 2008.  See Remand Results 22.

48g LWTP was not dumped in the United States market during
Commerce's period of investigation and therefore the Commission
should completely disregard the increase in imports of 48g LWTP
in its separate injury investigation and final determination.
The Commission declined to do so based in part on the Federal
Circuit's decision in <u>Algoma Steel Corp. v. United States</u>, 865
F.2d 240 (Fed. Cir. 1989), which, under the Commission's
interpretation, did not "compel or even authorize the Commission
to examine individual sales or model transactions considered by
Commerce." <u>ITC Original Determination</u>, USITC Pub. 4043 at 31
n.201.[5]  Because Commerce also had not issued a separate dumping
margin for 48g LWTP, the Commission concluded it was not
permitted to consider individual sales of 48g and 55g LWTP in its
injury determination.

Plaintiffs appealed to this court which affirmed the
Commission's determination.  <u>Koehler I</u>, __ CIT at __, 675 F.
Supp. 2d at 1191-92.  The Court of Appeals, however, vacated
<u>Koehler I</u>, holding that the Commission's refusal to consider
intermediate 48g dumping margins "was premised on a divergent

---

[5] The Commission also declined to disregard the increased
48g LWTP shipments based on 19 U.S.C. § 1677(35)(C)(ii), which
states that the dumping margin used by the Commission "shall
be . . . the dumping margin or margins most recently published by
[Commerce] prior to the closing of the Commission's
administrative record." <u>ITC Original Determination</u>, USITC Pub.
4043 at 31 n.201; 19 U.S.C. § 1677(35)(C)(ii).

reading of <u>Algoma</u>, and a misunderstanding of Koehler's request."
<u>Koehler II</u>, 413 F. App'x. at 231.  The Court stated that "<u>Algoma</u>
specifically allows for consideration of raw data in computer
print outs 'by reasons specific to the particular case . . . .'"
<u>Id.</u> (quoting <u>Algoma</u>, 865 F.2d at 242).  It reasoned that the
statute requires that Commerce make available to the Commission
all of the information upon which its determination was based,
<u>see</u> 19 U.S.C. § 1673d(c)(1)(A), including the sales prices of a
"subset of dumped goods," here the 48g LWTP.  <u>Koehler II</u>, 413 F.
App'x. at 231-32.  With regard to the Plaintiffs' request, the
Court of Appeals interpreted it as a request for the Commission
to make decisions "based on the price, measured as a dumping
margin, of a subset of dumped goods" and to analyze data that is
available to the Commission.  <u>Id.</u>[6]

    The Court of Appeals further held that while the ITC may not
change Commerce's determination that all of Plaintiffs' products
were being dumped at a rate of 6.50 percent, it was permitted to
examine and consider Commerce's intermediate calculations and

---

    [6] "Commerce analyzed seven of Koehler's LWTP products,
distinguished by weight . . . [and] found that six of the seven
Koehler products had positive dumping margins—meaning they are
being sold at [less than fair value].  As calculated by Commerce,
and reflected in Commerce's intermediate calculations, the only
Koehler product without a positive dumping margin was Koehler's
48 gsm LWTP product. The 48 gsm product constituted 38.15 percent
of Kohler's quantity of sales in the United States and made up
40.28 percent of the value of sales in the United States."
<u>Koehler II</u>, 413 F. App'x. at 229-30

subsets of the subject merchandise when making an injury

determination.  Id. at 231 (citing Cleo Inc. v. United States,

501 F.3d 1291, 1295 (Fed. Cir. 2007)).[7]

     Following the Appeals Court order and mandate, this court

remanded the matter to the Commission with instructions to

reconsider and revise its decision in accordance with the

decision of the Court of Appeals, indicating how any decision is

in accordance with Algoma Steel.

     Following the remand order, the Commission re-opened its

record to obtain additional material from the record of

Commerce's investigation.  Noting that neither the Appeals Court

opinion nor this court's remand order called into question the

Commission's findings or conclusions regarding domestic like

product, industry, or conditions of competition, the Commission

focused on "whether the information from the Commerce dumping

investigation warrants modification of the prior analysis that

there is a threat of material injury by reason of the subject

imports."  Remand Results 5.

     In affirming its finding of threat of material injury, the

Commission concluded that different weights of LWTP are or will

be dumped on the United States market in direct response to

---

     [7] The court emphasized that the Commission, not Commerce,
"determines whether all articles in the subject merchandise are
'like products,' which in turn make up an 'industry' for the
purposes of a dumping determination." Id. at 231.

market competition.  See Id. at 23.  Specifically, importers

respond to increased domestic production of and/or demand for a

particular weight of LWTP by dumping the same weight of LWTP on

the United States market.


### STANDARD OF REVIEW

The Department, in its remand redetermination, must comply

with the terms of the court's remand order.  Jinan Yipin Corp. v.

United States, __ CIT __, 637 F. Supp. 2d 1183, 1185 (2009).  In

addition, the court "shall hold unlawful any determination,

finding, or conclusion found ... to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i); Koyo Seiko Co. v. United States,

20 F.3d 1160, 1164 (Fed. Cir. 1994).

The substantial evidence standard of review "can be

translated roughly to mean 'is [the determination]

unreasonable?'" Nippon Steel Corp. v. United States, 458 F.3d

1345, 1351 (Fed. Cir. 2006) (alteration in original) (quoting

SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n, 718 F.2d 365, 381

(Fed. Cir. 1983)); Daewoo Elecs. Co. v. Int'l Union, 6 F.3d 1511,

1520 (Fed. Cir. 1993) ("The specific determination we make is

'whether the evidence and reasonable inferences from the record

support' [the agency's] findings." ).  Moreover, the possibility

of drawing two inconsistent conclusions from the evidence does

not render the agency's determination unreasonable, <u>Consolo v.</u>

<u>Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966), and where

"[s]ubstantial evidence exists on both sides of the issue[,]

. . . the statutory substantial evidence standard compels

deference to the [agency]." <u>Nippon Steel</u>, 458 F.3d at 1354.


**DISCUSSION**

While Commerce is charged with investigating whether

merchandise is being dumped on the domestic market and if so,

determining the dumping margin for such imports, the ITC is

responsible for determining whether an industry in the United

States is or will be threatened with material injury by reason of

these imports.  <u>See</u> 19 U.S.C. § 1673d(b).  The Commission's

analysis is, by its nature, of a different character and also

covers a different time period than the Commerce investigation.

<u>See</u> 19 U.S.C. § 1677(7)(F) (charging the ITC with the forward-

looking task of determining actual and potential effects of

imports of subject merchandise on the domestic industry).  The

governing statute requires that the Commission consider all

"relevant economic factors which have a bearing on the state of

the industry in the United States, including, but not limited to

actual and potential decline in output, sales, [and] market share

. . . . " when making its threat analysis.  19 U.S.C.

§ 1677(7)(C)(iii).[8]

In order to find a causal nexus between the subject imports and the domestic industry's condition, the Commission must find that the subject imports will have more than a tangential, trivial, or incidental effect on the industry,[9] and that further dumped imports are imminent.  19 U.S.C. § 1677(7)(F)(ii).  It is the Commission's charge to make findings of fact and, if it finds that there is injury to the domestic market, "explain, in a

---

[8] In relevant part, the statute states that "the Commission shall consider, among other relevant economic factors . . . any . . . substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States . . . and any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports . . . ."  19 U.S.C. § 1677(7)(F)(i)(II) & (IX).

[9] Under the "by reason of" standard of causation, subject imports must have more than an "incidental, tangential or trivial" effect on the industry. See Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1381 (Fed. Cir. 2003); see also Gerald Metals, Inc. v. United States, 132 F.3d 716, 721-22 (Fed. Cir. 1997); Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 873 (Fed. Cir. 2008).
Nonetheless, in making its determination, the Commission "need not isolate the injury caused by other factors from injury cased by unfair imports . . . [r]ather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, 156 (1994) reprinted in 1994 U.S.C.C.A.N. 4040, 4185 ("SAA").  The SAA accompanied the Uruguay Round Agreements Act ("URAA") and was approved by Congress as an "authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the URAA] in any judicial proceeding . . . concerning" the interpretation or application of the URAA.  19 U.S.C. § 3511(a)(2) and § 3512(d).

meaningful way," the causation of such injury.  Bratsk Aluminum
Smelter v. United States, 444 F.3d 1369, 1376 (Fed. Cir. 2006);
Mittal Steel, 542 F.3d at 874-75.  The Commission "must examine
the relevant data and articulate a satisfactory explanation for
its action."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.
Ins. Co., 463 U.S. 29, 43 (1983).

Here, pursuant to the directive from the Court of Appeals,
and the remand order of this court, the Commission considered
Commerce's intermediate dumping margin calculations and provided
a reasonable explanation for continuing to find a positive threat
of injury to the domestic industry.  First, the Commission
reopened the record to request further information from Commerce
regarding the interpretation of the Commerce data.  Remand
Results 9-10 (citing "Final Analysis Memorandum for Sales –
Koehler" Sept. 25, 2008, and "Cost of Production and Constructed
Value Calculation Adjustments for the Final Determination" Sept.
25, 2008, EDIS Doc. 454291).  The Commission noted that it was
required to weigh this information while conducting its overall
statutory directives.  Id. at 18.  In this context, and
responding to the court's remand order that it articulate how its
decision is consistent with Algoma Steel, the Commission found
that Commerce's intermediate calculations were "of limited
utility in an analysis of threat of material injury by reason of
subject imports" because they were not probative with respect to

the focal point of the Commission's threat analysis.  Id. at
19.[10]

     The Commission recognized "undisputed changes in conditions
of competition between the time covered by Commerce's dumping
investigation and the time period we have considered in analyzing
threat of material injury." Id. at 22. It further noted that
market participants anticipated growing demand for 48g LWTP,
indicated in part by Defendant-Intervenor's construction of a
facility in August 2008 with the intent to increase production of
48g LWTP.  Plaintiffs, the predominant German exporters of LWTP,
ceased bringing 55g LWTP into the United States in March 2008 and
indications are that future imports will be "heavily
concentrated" in 48g LWTP.  ITC Original Determination, USITC
Pub. 4043 at 37.

     In addition, the Commission recognized that "where
competition was most concentrated during the periods both
Commerce and the Commission investigated, Commerce calculated
much higher rates of dumping than the 6.50 percent weighted
average dumping margin it published in its final determination."

---

     [10] The Commission acknowledges that there is data from
Commerce's first administrative review showing that 48g LWTP from
Germany was sold at less than fair value after Commerce's initial
period of review.  However, because the data pertaining to
Commerce's review was not available during the Commission's
original investigation, the Commission has not considered it.
Remand Results 26 n.85.

Remand Results 23 (citing EDIS Doc. 454291). In this context, the
Commission gave weight to data indicating that "Koehler was
inclined to sell types of LWTP that competed directly with the
domestic like product in dumped transactions, while non-dumped
transactions tended to focus on a product type that was not at
the time produced domestically in significant quantities." Id.
at 24.[11]

    The Commission emphasized that "the focus of competition
between LWTP from Germany and the domestic like product [is] not
static, but in fact changed after Commerce's period of
investigation," and concluded that the imminent future would be
"characterized by more intense competition between domestically
produced and German 48 gram LWTP . . . ." Id. Therefore, in
light of the evidence that dumping transactions occurred for
products in direct competition, the Commission continued to find
that there is a threat of material injury to the domestic market
by way of imports of 48g LWTP. Id. at 23 ("In the circumstances
of this investigation, viewing Commerce's calculations for 48
gram LWTP as conclusive of likely conduct during the imminent
future is particularly inappropriate."). This conclusion is one
that has reasonably taken into consideration and explained the
"relevant economic factors" which have a bearing on the LWTP

_____

[11] Plaintiffs do not challenge this aspect of Commerce's
reading of the record. See Plaintiff's Comments, ECF No. 127.

industry in the United States.   See 19 U.S.C. § 1677(7)(C)(iii).

Plaintiffs concede that "the Commission is not required to tie each bit of injury to a dumped sale."  Plaintiff Comments 27. Nonetheless, the Commission's analysis does not ignore the role of dumping in causing injury to the domestic industry.  As noted above, the Commission concluded that imports entering in the imminent future would be heavily concentrated in 48g LWTP.  Faced with evidence that Koehler's pricing practices indicated much higher rates of dumping "where competition was most concentrated during the periods both Commerce and the Commission investigated," Remand Results at 23, the Commission concluded that it was unlikely that sales of the 48g LWTP will be at normal value.  Id. at 26.

The Plaintiffs raise two challenges to the remand determination.  First, Plaintiffs contend that the remand determination violates the mandate of the Federal Circuit.  The Plaintiffs correctly argue that "the Federal Circuit has already decided, either expressly or by necessary implication, that the computer printout showing a negative dumping margin for Koehler's sales of 48-gram [LWTP] is factually relevant and legally germane . . . ."  Plaintiff Comments 3.  Relevance, however, does not determine weight, and the Appeals Court did not supplant the Commission's role to weigh the evidence and, on remand, determine its effect.  Had the Appeals Court intended otherwise, no remand

would have been necessary.

Plaintiffs also argue that the following language in <u>Koehler</u>
<u>II</u> precludes the Commission from making an affirmative finding of
material injury:

> Instead, [the worksheet data] allows the Commission to
> take those calculations and apply its expertise to make
> a fair and equitable injury determination.  When the
> threat determination is based almost exclusively on one
> product within the subject merchandise, and that one
> product is not being sold at [less than fair value],
> the Commission should be able to use all materials at
> its disposal to make an equitable determination.  The
> Commission incorrectly denied Koehler's request, and
> incorrectly interpreted this court's holding in <u>Algoma</u>,
> when refusing to consider potentially dispositive
> intermediate data.

<u>Id.</u> at 7 (quoting <u>Koehler II</u>, 413 F. App'x. at 231-32).  However,
Plaintiffs' reliance is misplaced.  The Court of Appeals ordered
that the Commission examine the data that is required by statute
to be available to it and conduct a "thoughtful consideration" of
this data.  <u>Koehler II</u>, 413 F. App'x. at 231.  While recognizing
that the data was "potentially dispositive," the Court of Appeals
does not, either expressly or impliedly, hold that such data is
dispositive.  This is in keeping with the Court's prior holdings
that the Commission, not the courts, is the finder of facts in
injury proceedings.  <u>Mittal Steel</u>, 542 F.3d at 875; <u>Nippon Steel</u>,
458 F.3d at 1352.  Thus it was for the Commission to evaluate all
"relevant economic factors." Its affirmative threat finding is
based on a reasonable reading of the record.

### CONCLUSION

Because the Commission took into consideration the data submitted by Commerce and adequately explained its rationale for not giving them weight in its positive threat assessment and because the Commission's finding that the domestic market for 48g LWTP is threatened by way of imports from Germany is not unreasonable, its determination is affirmed.

Judgment will be entered accordingly.


                                        /s/ Donald C. Pogue
                                   Donald C. Pogue, Chief Judge



Dated: January 10, 2012
       New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| PAPIERFABRIK AUGUST KOEHLER AG and KOEHLER AMERICA,INC., | |
| Plaintiffs, | |
| – and – | |
| MITSUBISHI INT'L CORP., MITSUBISHI HI-TECH PAPER FLENSBURG GmbH, and MITSUBISHI HI-TECH PAPER BIELEFELD GmbH, | Before: Donald C. Pogue, Chief Judge |
| Plaintiff-Intervenors, | Court No. 08-00430 |
| v. | |
| UNITED STATES and the UNITED STATES INTERNATIONAL TRADE COMMISSION, | |
| Defendants, | |
| – and – | |
| APPLETON PAPERS INC., | |
| Defendant-Intervenor. | |

<u>**JUDGMENT**</u>

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that the International Trade Commission's Remand Results, Sept. 30, 2011, ECF No. 123, are AFFIRMED.

/s/ Donald C. Pogue
Donald C. Pogue, Chief Judge

Dated:    January 10, 2012
          New York, N.Y.